KENNETH M. DUNLOP, administrator of estate of LYDIA E. HEM-INGWAY, appellant, v. EMERY HEMINGWAY et al., appellees.

No. 48416.

(Reported in 63 N. W.2d 901)

April 7, 1954.

Kenneth M. Dunlop, of Iowa City, and Herman Walter, Special Assistant Attorney General, of Des Moines, for appellant.

Edward F. Rate, of Iowa City, for appellees.

SMITH, J.—It is conceded: the State of Iowa, through the State Board of Social Welfare, has a valid claim of $4094.12 against Lydia E. Hemingway's estate for old-age assistance; that decedent, on October 12, 1949, received a bequest of $4908.54 from her sister's estate; and that she executed a trust agreement on November 21, 1949, transferring same in trust for the payment of her necessary "care, comfort and maintenance * * * during her lifetime, * * * the expenses of her last illness and burial" and providing further that any amount remaining should be paid to defendants "in the proportion that each has heretofore contributed to the care and support of first party, such payment to be in partial compensation for such care and support."

Plaintiff alleges such trust and transfer were "without legal consideration, fraudulent and in violation of chapter 249, Code of Iowa, 1950" and that the fund "in equity and good conscience" should be turned over to plaintiff-administrator of her estate for payment of debts including the said claim of the Welfare Board.

The trial court dismissed plaintiff's petition and he appeals.

Defendants are nephew and niece of the decedent, Lydia, who died December 13, 1949, at the age of ninety-two years. She was sister to their mother and her husband was their father's brother. Her husband died in 1911. We are not told the date of defendants' father's death but it was apparently prior to 1918 when defendant Emery and his mother bought a home in West Branch, Iowa, each paying approximately half the purchase price.

From that time until 1931 Lydia lived with defendant· Emery Hemingway's mother in that home except for occasions she spent in the home of defendant Linna Gleason. During that entire period defendant Emery Hemingway "supplied the cash necessary for them to live other than what could be produced from the garden", and he paid all taxes, insurance, repairs and upkeep.

He and his family moved in with them in 1931 during the depression and stayed until he purchased a farm in 1941. His mother and Lydia then moved with him to his farm and lived there with him and his family except that Lydia stayed with defendant Linna and her husband for a period during which the farm home was being remodeled and also on other occasions. Decedent continued to live partly in Emery's and partly in defendant Linna Gleason's home until her death.

Decedent, Lydia, was the recipient of old-age assistance from November 1934 to November 1949. It began at $14 per month, was raised to $15 in 1935; to $23 in 1937; lowered to $20.40 in 1941; raised to $24.30 in 1943; to $25 in 1944; to $26.50 in 1946; to $26.70 in 1947; and to $29.90 in 1949.

The records of the Welfare Board reveal that not more than $18 out of the monthly payment was ever budgeted to payment of board and room. The rest of the monthly allotment was devoted to other items such as clothing, medical care, household remedies, hearing aid, etc.

Defendant Linna Gleason testified her aunt paid "from $10 to $15, but not every month." And defendant Emery Hemingway's wife said "she did give me $5 a month when she was able when—that is if there was enough left over from her own personal expenses of the month. * * * there were some months when the money * * * was entirely exhausted for clothing and doctor bills and things of that kind and in those months she did not pay us anything."

Further details of the record will be referred to as we proceed.

I. The trial court correctly held the burden of proof was on plaintiff to show lack of adequate consideration. The statute relied on as authorizing the suit is section 249.21, Iowa Code, 1950, the pertinent part of which reads: "Any transfer

of any property or interest therein made by an applicant or recipient of old-age assistance to any person without adequate consideration therefor or with intent to deprive the state of its interest therein shall be void."

The administration was granted and the suit is frankly brought for the benefit of the State Board of Social Welfare. The transfer by decedent is alleged to have been without "legal consideration." Plaintiff argues "defendants have utterly failed to prove" the transfer "was supported by adequate consideration."

That burden was not on defendants. We find nothing in either pleading or proof to suggest an exception to the unquestioned general rule that places the burden of proving an issue upon the party who affirms it. First National Bank v. Currier, 218 Iowa 1041, 1045, 256 N.W. 734; Williams Savings Bank v. Murphy, 219 Iowa 839, 841, 259 N.W. 467.

There is no claim here of undue influence by violation of confidential relationship to cast on defendants the burden of proof. There is pleaded rather a transfer by decedent in fraud of creditors. There is no claim she was defrauded or overreached or that she was incompetent in any degree, as was the situation in cases cited by plaintiff. See, e. g., Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873; Stout v. Vesely, 228 Iowa 155, 290 N.W. 116.

II. Defendants argue this proceeding is in the nature of a creditor's suit and plaintiff must prove his case by clear and satisfactory evidence in order to set aside an instrument that recites a valid consideration. The trial court so held.

Of course it is not technically a creditor's bill or suit. It is not brought by creditors nor is the creditor (for whose principal benefit it is maintained) a judgment or lien creditor. The trial court on the authority of Tullis v. Tullis, 235 Iowa 428, 16 N.W.2d 623, and cases therein cited, held the proof necessary to set aside a transfer at the suit of a creditor must be clear, satisfactory and convincing and that the State of Iowa, through the Social Welfare Board "must be dealt with on the same plans as a matter of law with other creditors."

There can be no question of the soundness of the first

part of the pronouncement. As to the second we observe first the Welfare Board here had no lien on the fund transferred by decedent. Code sections 249.19 and 249.20 expressly make the amount furnished for old-age assistance *a lien on real estate* and *"a claim of the second class against the personal estate* of such decedent, in the event the estate is admitted to probate." (Emphasis supplied.) Claims of the second class are those for "public rates and taxes." Code section 635.66. But this classification only relates to the matter of priority among charges and claims against an estate in distribution of the assets. It creates no lien during the owner's life and has no significance here.

Without doubt the property here involved *was* personalty. Under the will of decedent's sister it was the duty of the executors to convert all the property (including real estate) into cash before distribution to the various legatees. They did so and distribution was made in cash. The result was an equitable conversion of the real estate into personalty at the instant of testator's death. Ihle v. Ihle, 222 Iowa 1086, 270 N.W. 452; In re Estate of Sheeler, 226 Iowa 650, 661, 284 N.W. 799. Mrs. Hemingway received her bequest by check which she turned over to the trustee.

It follows from the foregoing that the state had only a preferred claim in the administration of decedent's estate. The trial court correctly held in effect that if the suit here were being maintained directly by the Welfare Board it would stand in the position of any general creditor. The plaintiff-administrator surely was in no better position.

The trial court therefore correctly held the plaintiff-administrator must prove his right to set aside the trust agreement and transfer by clear, satisfactory and convincing evidence. That seems to be the rule in any suit for cancellation of an executed contract, regardless of the ground upon which cancellation is sought. 12 C.J.S., Cancellation of Instruments, section 71; Harvey v. Phillips, 193 Iowa 231, 233, 186 N.W. 910. See Barks v. Kleyne, 198 Iowa 793, 795, 200 N.W. 439, 440, where we said:

"To assert successfully a demand by a creditor to set aside a conveyance given by his debtor in payment of * * * a

bona fide debt, it must be established by clear and satisfactory proof * * *.

"That a creditor may secure his claim, and in so doing receive a preference from his debtor, even though the debtor is insolvent, is well settled; but the bona fides of the transaction must be shown, or the transaction is impeachable. * * *

"The preference having been given to a bona fide creditor, the burden of proof is on him who challenges the transaction."

No logic requires or would support a holding that plaintiff here, or the Welfare Board in whose behalf the proceeding was initiated, is not subject to the same rule as applies to any creditor seeking in equity to set aside a transfer.

 III. Plaintiff pleaded that the trust agreement and transfer of funds were "without legal consideration, fraudulent and in violation of chapter 249, Code of Iowa, 1950." The statute itself says "without adequate consideration" or "with intent to deprive the state of its interest therein."

We have no doubt here of the *adequacy* of the consideration if the past services, under the circumstances shown, may be considered. The evidence fairly showed their value to be much larger than the $4900 turned over in trust. We shall not attempt to summarize further than we have already done the evidence covering thirty years of service, unrewarded except for the small payments made possible out of the meager old-age assistance furnished during the last fifteen. The trial court estimated that the evidence as to reasonable value of such service would show a total of approximately $4200 from 1931 to 1941 and as much more thereafter to the date of decedent's death and also that consideration must be given to the period prior to 1931. We are convinced the undisputed testimony shows "adequacy."

 The real question is whether Mrs. Hemingway's acceptance of the service entailed upon her an obligation to pay for it sufficient to constitute consideration for the trust agreement and transfer. Certainly where one person, without any legal responsibility to do so, performs services for another which are knowingly accepted, the law implies a promise by the recipient to pay therefor. In re Estate of Beck, 239 Iowa 655,

32 N.W.2d 217; In re Estate of Talty, 232 Iowa 280, 285, 5 N.W.2d 584, 144 A.L.R. 859.

There was no statutory responsibility here on the part of defendants to support their aunt. Such duty is by statute imposed upon the father, mother and children of any poor person (Code section 252.2); and upon grandparents ("if of ability without personal labor") and male grandchildren "who are of ability by personal labor or otherwise", Code section 252.5.

But we know of no similar legal obligation upon nephews and nieces. "The mere relationship of nephew and uncle does not in itself create a presumption of gratuitous service." Kerr v. Wilson, 284 Pa. 541, 543, 131 A. 468, 469.

Defendant Emery Hemingway, when pressed to answer whether he ever expected his aunt to repay him, answered: "Well, if you give a person money that doesn't have anything to pay it back with you may not expect it back unless they have the money to give it back to you, and that's a family tradition of ours, I think, that we help each other and at the same time we remember the obligation that the other person does for us"— certainly a wholesome philosophy eloquently, if somewhat ungrammatically, stated.

The written document itself not merely imports consideration under our statute (Code section 537.2) but affirmatively reveals and asserts consideration: "Any amount remaining" after payment of the expenses of last illness and burial "shall be paid out to [defendants] in the proportion that each has heretofore contributed to the care and support of first party, such payment to be in partial compensation for such care and support."

The record is practically silent as to whether decedent and defendants had any previous definite agreement or understanding. Defendant Emery, as plaintiff's witness, was asked on cross-examination: "Did she ever express to you an intention to see that you were paid for what was done for her if she could?" There was a long objection including incompetency of the witness under the "dead man's statute." The trial court properly held the objection on that ground had been waived by the direct examination and permitted the witness to "answer under the

rule." The answer was "She did." And to a second question the witness answered "On several occasions."

Another witness, defendant Emery's son, testified she once said: " 'Sometime I hope that I am able to repay you if my ship ever comes in.' " He says she smiled "in a nice friendly way" and added: " 'I don't think I will ever have a ship that comes in.' "

Certainly there is no evidence here the services were gratuitously rendered—only a mere suspicion based on the recipient's then inability to pay. The most that could be argued would be an inference of intended gratuity if she never became able to pay. Such a qualified inference, if it may be called such, would of course disappear when and if she became financially able.

But plaintiff contends there was a "family relationship", raising an inference of intended gratuity sufficient to overcome the usual presumption of an obligation to pay for services accepted. But the "family relationship" shown here may well have grown out of the rendition of the services. The relationship may have been the method, not the cause, of their rendition—the method that enabled defendants to support their aged and indigent aunt without consigning her to the care of strangers. We cannot hold it overcame by clear and convincing evidence the usual implication of an intention to pay.

The "family relationship" here certainly involved no real mutuality of service upon which such relationships are said to be in part, at least, based. See In re Estate of Kleinhesselink, 230 Iowa 1090, 1094, 300 N.W. 315; Hankins v. Young, 174 Iowa 383, 392, 156 N.W. 380. "The duties are reciprocal, and the services are presumed to be reciprocal." Snyder v. Nixon, 188 Iowa 779, 781, 176 N.W. 808, 809. Decedent was seventy-three years old when she became a member of defendant Emery Hemingway's family in 1931. The relationship continued almost twenty years thereafter. Any services she rendered during those years were comparatively too insignificant in value to create any real mutuality. The records of the Welfare Board and decedent's own diary, as well as the testimony in the record, all show the services she was able to perform were negligible.

During the period from 1918 to 1931 defendant Emery practically supported his mother and decedent in a home of which he was part owner, entirely apart from his own home. They all

later began living in the same house when he and his family moved in with his mother and aunt in 1931. But even then they were living in defendant's, not decedent's, home. Defendant continued to maintain it until 1941 when they all moved out to his farm.

It is said in 34 C. J. S., Executors and Administrators, section 371b(6), page 115: "Even where claimant and decedent lived together, but did so in the home of claimant, there is not a sufficient reciprocity in benefits or a sufficiently close relationship [between uncle or aunt on one side and nephew or niece on the other] to rebut the presumption or implication of an agreement or promise to pay the reasonable value of the board, lodging, and care furnished."

The term "family relationship", when used as implying the creation of some *obligation* to furnish support, means something more than the mere fact that a collective body of persons live together under one head. "It must appear that they are being supported by that other in whole or in part, and are dependent on him therefor, *and, further, that he is under a natural or moral obligation to render such support.*" (Emphasis supplied.) Sheehy v. Scott, 128 Iowa 551, 553, 104 N.W. 1139, 1140, 4 L.R.A., N. S., 365. There is no such "natural or moral" obligation shown here.

It was pointed out in In re Estate of Talty, supra (232 Iowa at page 283) that "the matter of family relationship was a special defense" which the representative of the estate was required to plead in resistance to a claim in probate for nursing and care. The present case arises in another way and the rule of pleading was possibly inapplicable. But the burden of proof remains the same. Plaintiff has failed to meet it.

IV. Plaintiff pleads "that in equity and good conscience" the fund should now be turned over to plaintiff for the purpose of paying the claim of the Welfare Board. Under the statute (Code section 249.5) the decedent, in 1934, became "entitled to assistance" from the Welfare Board. The burden of her support was on the state.

The director of the Social Welfare office in Iowa City testifies that in 1949 decedent might have been allowed $55 per month in Johnson County if without friends or relatives. "If she had

not been living with somebody she could not have lived on $29.90 and that is true during all the time that has been testified to."

The old-age assistance investigator in 1937, while reporting "no responsible relatives", also reported "cost of keep over and above O.A.A. (old-age assistance) granted is taken care of by the relatives." The Welfare Board records show it was realized at all times that the payment being made would be utterly inadequate were it not for the services being rendered to the recipient by defendants.

The "equity and good conscience" argument might well be reversed if it is to be considered at all. It could be plausibly suggested that defendants had saved the state from 1934 to decedent's death substantially more than is involved here in order that their aunt might not be left to the care of strangers.

But that is not the question here. The statute condemns a transfer "without adequate consideration therefor or with intent to deprive the state of its interest therein." We cannot say plaintiff has shown by clear and convincing evidence that there was lack of "adequate consideration" or any bad faith in the transfer sought to be set aside. It was a preference of one creditor over another but the bona fides of the transaction has not been successfully challenged. Barks v. Kleyne, supra, 198 Iowa at page 795, 200 N.W. at page 440.

Much more might be said. The arguments (as is not entirely unusual) go somewhat far afield. One brief urges eleven propositions in as many divisions, including thirty-seven "brief points." From our own experience in the law practice we are mindful of the advocate's constant fear he may overlook something material. We have given consideration to all the arguments and have covered everything needful to a proper disposition of the case. The decision of the trial court must be and is affirmed.—Affirmed.

BLISS, C. J., and OLIVER, GARFIELD, WENNERSTRUM, MULRONEY, HAYS, and THOMPSON, JJ., concur.

LARSON, J., takes no part.